IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| MELISSA LEE<br>SSN: XXX-XX-6523, | ) ) ) | Civil No. 2:09-CV-01136-BSJ |
| Plaintiff, | ) ) | **MEMORANDUM DECISION AND**<br>**ORDER ON ADMINISTRATIVE** |
| vs. | ) ) | **APPEAL** |
| MICHAEL J. ASTRUE,<br>Commissioner, Social Security<br>Administration, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**FILED**
CLERK, U.S. DISTRICT COURT
June 23, 2011 (11:15am)
DISTRICT OF UTAH

* * * * * * * * *

Plaintiff Melissa Lee filed suit seeking judicial review of the Commissioner's decision
denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI") under Titles II and XVI of the Social Security Act, respectively. *See* 42 U.S.C.
§§ 401-33, 1381-1383f.[1]  The matter came before this Court for oral argument on September 1,
2010.  Bradley N. Roylance appeared on behalf of the Plaintiff Melissa Lee and Anthony J.
Navarro appeared on behalf of the Defendant.  Having considered the parties' briefs, the
administrative record, the arguments of counsel, and the relevant law, the Commissioner's
decision is REVERSED and REMANDED for the reasons outlined below.

## PROCEDURAL HISTORY

Ms. Lee applied for SSI and DIB on April 26 and 27, 2006.  (Administrative Record, filed
Apr. 26, 2010 (dkt. no. 11)("AR"), at 197, 203.)  Her application for SSI indicates her disability

---

[1] All references to the *United States Code* (U.S.C.) are to the 2006 edition and 2010 supplement where
applicable.

began on June 25, 2005; however, her application for DIB states she "became unable to work because of [her] disabling condition on June 25, 2004." (AR 197, 203.) The inconsistency in the onset date is unexplained, but at the request of counsel the onset date was amended to June 29, 2005.[2] (AR 29.) The requested benefits were denied initially and also upon reconsideration. (AR 91, 100, 103.) Ms. Lee appealed and was afforded a hearing before an Administrative Law Judge ("ALJ") on September 24, 2008. (AR 26.) The ALJ issued her decision on February 26, 2009 and found Ms. Lee was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (AR 25.) *See* 42 U.S.C. §§ 416(i), 423(d), and 1382c(a)(3)(A). The decision of the ALJ became the final decision of the Commissioner of Social Security when the Appeals Council denied Ms. Lee's request for review. (AR 1-4.) *See Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). Ms. Lee now appeals the decision of the ALJ regarding whether she is "disabled" within the meaning of the Social Security Act due to impairments resulting from her mental illness. (AR 194.)

**STATEMENT OF FACTS**

Melissa Lee was born on August 26, 1965, making her thirty-nine years old at the time of her alleged disability onset. (AR 23.) She has a high school education and attended one year of college. (AR 23, 64.) Ms. Lee estimates that she has worked for about one-fourth of her adult life. (AR 372.) She has worked as an assistant manager at a fast food restaurant (light, skilled work), a car hop (light, unskilled work), and as a restaurant server (light, semi-skilled work).

---

[2] The request to amend was due to a prior decision by an ALJ finding Ms. Lee not disabled. "Res judicata precludes a finding of disability prior to the date of denial of a claimant's previous application." *Weber v. Astrue*, No. 2:09-CV-00712-BSJ, 2010 WL 1727380, at *1 n.2 (D. Utah Apr. 28, 2010) (citing *Fair v. Bowen*, 885 F.2d 597 (9th Cir. 1989). Thus, Ms. Lee amended her onset date to one day after the unfavorable decision.

(AR 23.)  Ms. Lee last met the insured status requirements of the Social Security Act on September 30, 2008.  (AR 10.)

Ms. Lee claims her disability stems from her history of knee problems and mental illness. (AR 11, 30.)  Her appeal is based primarily on the ALJ's findings related to claimed impairments resulting from her mental disorders.  (AR 30.)

Ms. Lee had a tumultuous childhood and has struggled with substance abuse for a large portion of her life.  (AR 286, 301, 371.)  In 1971, at age six, Ms. Lee was sexually molested by a relative.  (AR 287.)  The State Department of Public Welfare held an investigation and among other findings, "strongly recommended that Melissa receive psychological counseling."  (AR 293).  This statement is the first of many related to Ms. Lee's mental health in the administrative record.

In 1986, at age twenty, Ms. Lee was seen by a clinical psychologist during her brief service in the Navy.  (AR 344.)  At the time, Ms. Lee reported that she had "no friends . . . was hospitalized for 64 days in May 84 and Aug 86 in a state mental hospital for drug addiction.  Her family doctor prescribed tranxene and librax for 'nerves' in Sep 84 which she took until Nov 84 (when she became pregnant) . . . ."  (AR 344.)  The doctor noted that Ms. Lee was alert and cooperative, but that she appeared distraught and tearful throughout the interview.  She also admitted having auditory hallucinations of her name being called that had started when she was ten years old.  (AR 344.)  The doctor's impression was that Ms. Lee had "[a]djustment disorder severe manifested by superstitionness [sic], social isolation, constricted affect, suspiciousness, and recurrent illusions."  (AR 344.)

In 2000, after being found guilty on a drug paraphernalia charge (a marijuana pipe), Ms. Lee was referred by court order to Valley Mental Health ("VMH") for treatment. (AR 567.) In her assessment following Ms. Lee's first visit, Leslie Larsen, LCSW, provided the following diagnostic impression: amphetamine dependence in early partial remission, cannabis dependence in early partial remission, alcohol abuse, bi-polar I disorder (most recent episode depressed), and personality disorder with borderline features. (AR 570.) Ms. Larsen assessed Ms. Lee's Global Assessment of Functioning ("GAF")[3] score as 48. (AR 570.) Ms. Lee continued to be seen at VMH, although sometimes sporadically, from 2000 until her hearing before the ALJ. (AR 49.)

The substance of the medical opinions from doctors at VMH and the medical expert in this case is addressed below in conjunction with the relevant law and analysis. Opinions specifically addressed include those of the medical expert Dr. Michael Enright, as well as Ms. Lee's treating sources, Drs. Elizabeth McGill and Elizabeth Albertsen. Also summarized and addressed below is Ms. Lee's hearing testimony and the testimony of the vocational expert John Hurst.

In her decision the ALJ followed the familiar and required five-step sequential evaluation

---

[3] The GAF scale is a one-hundred-point scale used to assess an individual's level of social, psychological, and occupational functioning. A score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* 34 (2000) (hereinafter "DSM-IV-TR"). A score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* A score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

process for disability claims. 20 C.F.R. § 404.1520(a)(4)[4]; *Hamlin v. Barnhart*, 365 F.3d 1208, 1212 (10th Cir. 2004). At step one, the ALJ concluded that Ms. Lee had not engaged in substantial gainful activity since June 25, 2004. (AR 11.) At step two, she determined that Ms. Lee had the following severe impairments: "degenerative joint disease in bilateral knees, personality disorder, bipolar disorder, anxiety disorder, ADHD and substance abuse."[5] (AR 11.) At step three, the ALJ found Ms. Lee had no impairment or combination of impairments that satisfied or was medically equivalent to any of the listed impairments found in Appendix 1 of Part 404. (AR 11-12.) None of these findings are challenged.

Prior to making her step four determination, the ALJ concluded that Ms. Lee has the Residual Functional Capacity ("RFC") for light work with these limitations:

> She must be able to alternate between sitting and standing. She can never climb ladders, ropes or scaffolds. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She has mild mental limitations (some limitations, but can function well up to 90% of the time or more) in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept

---

[4] All references to the *Code of Federal Regulations* (C.F.R.), unless otherwise specified, are to the 2010 edition of Title 20, Part 404 of the regulations, which addresses claims under Title II of the Social Security Act. All of the cited regulations have parallel citations in Part 416 of the regulations, which addresses claims under Title XVI of the Act.

[5] This finding of severe mental impairments at step two appears suspiciously inconsistent with the ALJ's later finding that Ms. Lee's mental impairments are "mild." The inconsistency strongly suggests—and the record supports—a finding that Ms. Lee's limitations as a result of her mental impairments are more than "slight abnormalities." *See Cowan v. Astrue*, 552 F.3d 1182, 1186 (10th Cir. 2008). The Tenth Circuit has previously noted this troublesome inconsistency. *See Givens v. Astrue*, No. 07-5021, 251 F. Appx. 561, 567, 2007 WL 3046302 (10th Cir 2007) (unpublished) (remanding case to agency because mental impairments found severe at step two were not included in RFC assessment). The Court raised this issue at oral argument sua sponte, as it is permitted to do, and reviewed supplemental briefs by the party which were considered in reaching its disposition. *Anderson v. U.S. Dept. of Labor*, 422 F.3d 1155, 1175 (10th Cir. 2005).

instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.

(AR 12.)  However, with this RFC the ALJ found Ms. Lee was incapable of performing her past relevant work.[6]  (AR 23.)

Finally, at the fifth step in the evaluation process based on the testifying vocational expert's response to her hypothetical question, the ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy."[7]  (AR 24.)  Representative occupations identified by Mr. Hurst that Ms. Lee could perform with the limitations expressed in the hypothetical and noted by the ALJ include: medical assembler, small parts assembler, and cashier II.  (AR 24.)  Because she found Ms. Lee was capable of performing other work, the ALJ concluded Ms. Lee "has not been under a disability from June 25, 2004 through the date of this decision [February 26, 2009]."  (AR 24.)

Although Ms. Lee's knee troubles limit her to light or sedentary work, the primary component of her disability claim is her mental illness.  (AR 30; Plaintiff's Opening Brief, filed July 20, 2010 (dkt. no. 16) ("Pl's Br."), at 11-20.)  Ms. Lee contends that the ALJ erred by

---

[6] Past relevant work is defined as "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1).

[7] It is not clear from the ALJ's decision to what other work Ms. Lee has successfully adjusted.  Ms. Lee testified that her most recent job was as a shift manager at Taco Bell in May 2010.  (AR 48.)  She remained in the position for about one month, but the job ended because "physically [she] just couldn't handle it" due to her knees. (AR 49.)

improperly rejecting the opinions of her treating and examining doctors, by improperly rejecting her testimony, and by failing to identify jobs available in significant numbers that were consistent with her specific functional capabilities. (*Id.* at 8.) Ms. Lee argues that these errors resulted in a flawed finding of her RFC, which in turn resulted in a flawed finding regarding whether she is capable of performing other work, and ultimately a flawed finding regarding whether she is disabled and eligible for disability benefits. The law and facts relevant to each of Ms. Lee's arguments are addressed in turn below.

## DISCUSSION

The Commissioner's decision is reviewed to "determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007); *Castellano v. Sec'y of Health & Human Services*, 26 F.3d 1027, 1028 (10th Cir. 1994). "In determining whether there is substantial evidence to support the ALJ's decision, the reviewing court must examine evidence in the record that fairly detracts from its weight." *Burton v. Heckler*, 622 F. Supp. 1140 (D. Utah 1985) (Jenkins, J.) (citing *Universal Camera v. NLRB*, 340 U.S. 474, 488 (1951)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano*, 26 F.3d at 1028. "[M]ore than a scintilla, but less than a preponderance" is required for evidence to be substantial. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Stated another way, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record." *Id.* In making a determination of whether the Commissioner's decision is supported by substantial evidence the Court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax*, 489 F.3d. at 1084.

## A. Medical Opinions

The Commissioner must consider all evidence to determine whether an individual is under a disability. 42 U.S.C. § 423(d)(5)(B).

> The term "disability" means--(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . (2) For purposes of paragraph (1)(A)--(A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d). Generally, it is the obligation of the claimant to produce evidence to prove that he or she is either blind or disabled, including evidence used to make a finding regarding the claimant's RFC. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a), 404.1545(a)(3). However, the Commissioner has an affirmative duty to "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d). Every medical opinion, regardless of the source, is evaluated when making a determination of whether a claimant is or is not disabled. 20 C.F.R. § 404.1527(d).[8] The following six factors are considered in deciding the weight given to a particular medical opinion:

---

[8]An SSA final rule published in 76 Fed. Reg. 24802 (May 3, 2011), effective June 13, 2011, substantially amended several portions of 20 C.F.R. §§ 404, 405, 416, and 422. The summary indicates that the SSA is eliminating the Decision Review Board. However, because the changes are not effective until June of this year, the previous version is used in this analysis. Generally, where an agency rule represents a shirt from a clear prior policy, the rule will not be applied retroactively. *See Farmers Telephone Co., Inc. v. F.C.C.*, 184 F.3d 1241, 1251 (10th Cir. 1999) (applying five-factor balancing test and holding the FCC's ruling could be applied retroactively). Even if the changes were applicable, they do not change the substantive portions of the regulations relied on in this case. There are also proposed changes to § 405 related to how the SSA collects and considers evidence of disability. *See* Notice of Proposed Rulemaking, 76 Fed. Reg. 20282 (April 12, 2011).

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (relying on factors listed in § 404.1527(d)(2)).  The ALJ need not explicitly discuss all of the factors to determine what weight to give a medical opinion so long as there is a basis for meaningful review of the ALJ's decision.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

A medical opinion from a treating source is entitled to "controlling weight" if that "source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996).  A "medical opinion" is an opinion "about the nature and severity of an individual's impairment(s)," including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite the impairment(s), and any physical or mental restrictions."  20 C.F.R. § 404.1527; SSR 96-2p.  A "treating source" is a "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with "medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.

When evaluating medical opinions of a treating source the ALJ must perform a two-step inquiry.  First, the ALJ must determine whether a particular opinion should be given controlling weight.  20 C.F.R. § 404.1527(d); *Langley*, 373 F.3d at 1119; *Krauser v. Astrue*, No. 10-5103,

9

4:08-cv-00422-TLW, *10-11 (10th Cir. May 6, 2011) (applying SSR 96-2p).  Second, if the opinion of a treating source is not given controlling weight, then the ALJ should consider the factors listed in § 404.1527(d)(2) to determine how much weight should be given to the opinion. Medical opinions of treating sources are entitled to deference even if they are not deemed controlling.  SSR 96-2p.  "If an ALJ rejects the opinion of a treating physician, he or she must articulate 'specific legitimate reasons' for doing so."  *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994); SSR 96-2p, at *5.  "Additionally, "[w]hen a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

The Commissioner, and thus the ALJ, has a duty to recontact a claimant's treating psychologist if the evidence from the source is inadequate for the Commissioner to determine whether the claimant is disabled.  20 C.F.R. § 404.1513(e); SSR 96-2p, at *4.  Specifically, the Commissioner "will seek additional evidence or clarification from [the claimant's] medical source when the report . . . contains conflict or ambiguity that must be resolved, [or] the report does not contain all the necessary information . . . ."  *Id.*

With these principles in mind, the Court turns to the substance of the medical opinions in this case to evaluate whether the correct legal standards were applied and whether substantial evidence supported the related findings of the ALJ.  Ms. Lee claims the ALJ failed to give appropriate consideration to the opinions of her treating psychologists, Drs. Albertsen and McGill, and another physician, Dr. Finnegan.  Implicit in Ms. Lee's argument that her treating source opinion should have been afforded greater weight is the suggestion that too much weight

was given to the opinion of the medical expert Dr. Enright.

### *Dr. Enright*

Dr. Enright is a licensed psychologist in Wyoming and was the medical expert in this case. (AR 26, 185-186.) In order to assess Ms. Lee's functional limitations, Dr. Enright reviewed Ms. Lee's medical file and observed her at the hearing. (AR 18, 37-38.) He is not a treating source. (AR 18.) The ALJ began her examination of Dr. Enright by asking whether Ms. Lee had impairments that met one of the mental health listings in Appendix 1 of Part 404. Dr. Enright stated that there was "documentation that would suggest or support a combination of those severe disorders equally the bi-polar disorder, the post traumatic stress disorder, the attention deficit disorder and the personality disorder." (AR 38.) However, he expressed concern that there were not specific references in Ms. Lee's medical records that documented the severity of her limitations resulting from the disorders. (AR 42.) Therefore, he found that she did not meet a listing, and at the prompting of the ALJ, he moved on to provide testimony related to Ms. Lee's RFC. (AR 42-43.) Dr. Enright opined that Ms. Lee had either mild or no limitations in the twenty mental functioning categories related to work activity used by the SSA to evaluate RFC. (AR 67-68.) He based his opinion primarily on the treatment records from VMH. (AR 67.)

Dr. Enright also opined that Ms. Lee was improving: "[s]he probably improved as she stopped taking drugs. She's continued with the treatment. The seriousness of her condition has also improved or has mitigated over time." (AR 41, 66.) When questioned by Mr. Roylance about this "improvement," Dr. Enright pointed to a few examples in the treatment notes. The notes identified by Dr. Enright state:

- April 16, 2008: "Client reported no substance use since last session, period. Mood, mildly depressed;" (AR 79)

- August 31, 2007: "'I'm doing better.' Spoke with client by phone. She's proud of having graduated from her CCET class;" (AR 79)

- June 12, 2007: "mental status mood is somewhat labile and tearful. Affect is anxious. She does complain of depression. No overt evidence of suicide or homicidal thoughts but behavior suggests it might be present. Denies auditory or visual hallucinations, denies paranoia. Her cognition was grossly intact though not formally tested. She seems to process information better this time. This was a medication recheck where she came back in and had started the new medication." (AR 79-80.)

The ALJ found the opinion of Dr. Enright persuasive and therefore adopted his conclusion concerning Ms. Lee's limitations and incorporated them into her determination of Ms. Lee's RFC. (AR 18.)

Substantial evidence does not support the weight the ALJ gave to Dr. Enright's opinion. The ALJ mentioned the six factors she must use to evaluate each medical opinion, but did not apply them in a way that can be meaningfully reviewed. In one short paragraph the ALJ concluded that Dr. Enright's opinion was persuasive. (AR 18.) While it is clear how much weight was given to Dr. Enright's opinion, it is not clear why his opinion was entitled to such great weight. Although the ALJ need not discuss all of the factors, the only factor touched on in this case is the fourth factor, consistency.

The ALJ points out that Dr. Enright's assessment that Ms. Lee has no or only mild

limitations is consistent with Dr. Brill's opinion. On September 22, 2006, Dr. Brill concluded in a Psychiatric Review Technique Form that Ms. Lee's degree of limitation was mild for: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining concentration, persistence, or pace. (AR 547.) However, Dr. Brill is also not a treating source for Ms. Lee and the ALJ failed to address the *inconsistency* of Dr. Enright's opinions with those of Drs. Albertsen and McGill—both treating sources. Without a more detailed discussion of the factors relevant to the weight given to Dr. Enright's opinion, it cannot be said that substantial evidence supports the ALJ's evaluation.

Moreover, it is not clear that the testimony given by Dr. Enright was critically examined. For example, Dr. Enright states that Ms. Lee is "improving." While it is true that there are some treatment notes that indicate progress, Dr. Enright failed to explain the larger number of notes that indicate decline or fluctuation: November 3, 2006 ("things are really stressful") (AR 571); February 1, 2007 (client reported drug use, depressed mood, crying) (AR 628); April 24, 2007 ("I need to come back to treatment") (AR 631); May 25, 2007 ("I need to come back to treatment") (AR 632); May 29, 2007 (Mood and affect anxious and her thinking "was not clear." Also, "moderately depressed mood" and "attempted suicide about two weeks ago") (AR 633–634); June 12, 2007 ("continues to report ongoing stressors . . . complain[s] of depression.") (AR 635); May 14, 2008 ("depressed mood. She was evicted from her apartment . . . superficially cut her wrist recently.") (AR 644); May 28, 2008 (distress level "moderately high," "sometimes" has thoughts of ending her life) (AR 645); September 28, 2008 ("still cry a lot," Dr. McGill "unsure she will ever be able to work full time.") (AR 657).

Rather than showing a pattern of improvement, the treatment notes from VMH show a

pattern of ups and downs.  While it is not the place of the reviewing court to reweigh the evidence, where substantial evidence does not support the opinion of an expert heavily relied on by the ALJ, the case must be remanded for further consideration.  Additionally, as noted above, the ALJ's brief discussion of Dr. Enright's opinion furnishes an insufficient basis for meaningful review.  The ALJ does not need to refer to every factor listed in 20 C.F.R. § 404.1527(d)(2), but reasons must be articulated with specificity as to why Dr. Enright's opinion is persuasive. Conclusory statements that Dr. Enright's "assessment is consistent with the State agency physician findings" and that he "had an opportunity to review the entire medical record and to see and hear the claimant at the hearing" do not provide enough detail for meaningful review. Thus, the case must also be remanded on this ground.

### Dr. Albertsen

Dr. Elizabeth Albertsen, Psy.D. treated Ms. Lee at VMH.  (AR 645.)  Dr. Albertsen first appears in the record on February 16, 2005, when she signed a Workplace Functional Ability Medical Report for Ms. Lee.  (AR 667.)  The report indicates that Ms. Lee can work "0" hours per week and that Ms. Lee is "undergoing medication changes and [illegible word] is not stable. Not appropriate for work at this time."  Interestingly, however, in the same report an "X" marks the box indicating that Ms. Lee's Current Functional Ability Profile Level for the Psychiatric/Psychological/ Emotional Category is nine out of ten.  The next record involving Dr. Albertsen is another Workplace Functional Ability Medical Report dated June 29, 2005.  (AR 664–665.)  Again, the report indicates a nine out of ten functional ability in the Psychological Category, but states that she can work "0" hours per week and "is appealing for disability.  Not stable to cope with the stressors of work."  (AR 665.)

A treatment note on May 22, 2008 states Ms. Lee "has been transferred to me [Dr. Albertsen] and wants to schedule appt but has no phone for me to call her back." (AR 644-645.) Six days later the two met for individual psychotherapy for one hour. In the brief treatment note Dr. Albertsen wrote that Ms. Lee's distress level was "moderately high" and that she "sometimes" had thoughts about ending her life. (AR 645.) The next record from Dr. Albertsen is a Work Capacity Evaluation (Mental) completed with Dr. Emily Harris.[9] (AR 670.) Drs. Albertsen and Harris noted that Ms. Lee has marked limitations in eight categories, moderate limitations in five categories, and none/mild limitations in the remaining seven categories. (AR 670-671.) Beneath each section Drs. Albertsen and Harris describe medical/clinical findings that support their assessment. For example, under the section titled "understanding and memory" they note "Ms. Lee reports many difficulties, such as consistently boarding the wrong train, or bus, forgetting directions or instructions, and general confusion in getting through each day." (AR 670.)

The final record in Ms. Lee's case file referencing Dr. Albertsen is an undated Medical Report related to Ms. Lee's application for Social Security Disability. (AR 669.) The first and last dates of treatment are listed as September 7, 2004 and October 8, 2008, which indicates the report was written some time after October 8, 2008. The report is fairly factual in nature. It provides Ms. Lee's diagnoses—bipolar disorder (currently depressed), amphetamine dependence (early full remission), and cannabis abuse (early full remission)—as well as her medications, the side effects, and the quantity of therapy sessions she had attended up to that point at VMH.

---

[9] Dr. Harris does not appear anywhere else in the administrative record.

After very thoroughly summarizing the opinion expressed by Dr. Albertsen, the ALJ found that it was not entitled to controlling weight. (AR 20.) Furthermore, the ALJ found the opinions of both Dr. Albertsen and Dr. Harris to be "largely unpersuasive" and gave them "considerably diminished weight." There are two primary reasons the ALJ discounted the opinions of these doctors: (1) the lack of supporting progress notes, and (2) alleged contradictions in the Work Capacity Evaluation. The ALJ gave the following example of an alleged contradiction, "[o]n one hand, they indicated the claimant has marked limitations in her ability to *understand and remember* detailed instructions, but she has only moderate limitations in her ability to *carry out* detailed instructions." (AR 20 (emphasis added).) Finally, the ALJ stated that the opinion is inconsistent with those of Dr. McGill, Dr. Enright, and "State agency physicians." (AR 20.)

Ms. Lee argues that the lack of progress notes is not a proper ground for giving a treating source's opinion diminished weight. She points to Social Security Ruling 96-2p which states:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means *only* that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p (emphasis added). Ms. Lee also asserts that the ALJ's determination that there were inconsistencies in the medical records is incorrect. For example, Ms. Lee points out that the alleged inconsistency noted above is not uncommon or even inconsistent. She asserts that "for many individuals, the ability to carry out tasks is not as serious a limitation as the ability to

remember the instructions."  Thus, some individuals are capable of carrying out detailed tasks so

long as they have written instructions.  (Plaintiff's Reply Brief, filed Aug. 26, 2010 (dkt. no. 19)

("Pl's Reply"), at 3.)  Finally, Ms. Lee argues that the ALJ's assertion that Dr. Albertsen's

opinion is contradicted by other doctors in the record is too vague, fails to identify specific

instances where the opinions differ, and is factually inaccurate.  Ms. Lee contends that the

opinions of at least Dr. Albertsen and Dr. McGill are consistent because both opined that Ms. Lee

is not capable of full-time employment.  (*Id.* at 4.)

The Commissioner asserts that the ALJ was correct in the weight she gave to the various

medical opinions.  With respect to Dr. Albertsen, the Commissioner argues that the ALJ

"reasonably concluded that the fleeting and intermittent relationship between Plaintiff and Dr.

Albertsen, as well as the utter absence of support in the treatment notes for the opinions of Dr.

Albertsen (an allegedly treating physician), seriously undermined Dr. Albertsen's opinions."

(Defendant's Answer Brief (dkt. no. 18) ("Def's Br."), at 14.)  The Commissioner contends that

the lack of treatment notes is evidence that Dr. Albertsen did not regularly treat Ms. Lee, that she

did not begin treating Ms. Lee in 2004 as the 2008 medical report indicated, and that the

functional limitations Dr. Albertsen described were merely unsupported conclusions.

The Commissioner suggests this case is similar to *Castellano v. Sec'y of Health &

Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994), in which the Tenth Circuit affirmed the

Secretary's decision denying disability benefits.  The plaintiff in *Castellano* claimed he was

disabled due to severe pain associated with his back, and on appeal he argued that the ALJ did

not give proper weight to the opinion of his treating physician that he was "totally disabled."  *Id.*

The Tenth Circuit found that the "ALJ acted in accordance with the regulations in not accepting

the treating physician's opinion" because the physician's opinion contradicted his earlier treatment records which indicated that the plaintiff could "return to some kind of light or sedentary work." *Id.* Moreover, the ALJ found that the opinion was not supported by objective medical evidence—the x-rays were normal, the plaintiff had a good range of motion, and he used pain medication sparingly. *Id.*

This case is distinguishable from the *Castellano* case. The ALJ in this case repeatedly discounted the opinions of treating and examining medical sources—not because of inconsistencies or conflicts between the treatment notes and their assessment of functional limitations, but rather because there were few treatment notes at all. Because the ALJ has an affirmative duty to recontact treating sources if she finds the evidence from the source inadequate to determine whether the claimant is disabled, the ALJ here should have contacted Dr. Albertsen if she did not believe the existing progress notes supported her opinion or thought there was a conflict or ambiguity in the reports that needed to be resolved.[10] *See* 20 C.F.R. § 404.1513(e); SSR 96-2p, at *4. Rather than making a ruling on what is not present in the record, the ALJ should rule on what is there and if she finds the opinion of a treating physician inadequate or unsupported, then she must recontact that physician.

Additionally, the ALJ is critical of the opinion provided by Dr. Albertsen because she found it inconsistent with those of Dr. McGill, Dr. Enright, and State agency physicians (presumably Dr. Brill). The ALJ is correct that Dr. Albertsen's opinion indicates more severe

---

[10] One conflict in particular that may be worth investigating is the apparent inconsistency between Dr. Albertsen's assessment that Ms. Lee had a nine out of ten functional ability and her subsequent finding in the same document that Ms. Lee can work "less than full-time," "0" hours per week. (AR 664–665, 666–667.) If a person is highly functional the implication is that they *can* work and *can* function, not the opposite.

limitations than those of Dr. Enright and Dr. Brill—two non-examining sources. However, it is puzzling that the ALJ relies upon the inconsistency with Dr. McGill's opinion since she later goes on to state that she finds Dr. McGill's reports "unpersuasive" and chooses not to give them controlling weight. (AR 21.)

To ensure that the record on which the ALJ makes her determination is complete, this case must be remanded for the ALJ to recontact Dr. Albertsen to seek additional evidence and clarification. Upon receiving clarification or additional evidence, the ALJ should then be able to address the six factors listed in 20 C.F.R. § 404.1527(d)(2) and determine the proper weight Dr. Albertsen's opinion should be given. It should be noted that deference is generally given to the opinions of treating sources.

### Dr. McGill

Liz McGill, Ph.D., is a psychologist practicing in Salt Lake City. (AR 661.) Dr. McGill first examined Ms. Lee on June 18, 2008, according to a Form 20M—a Mental Status and Treatment Progress Report—related to Ms. Lee's application for Medicaid Disability Benefits. (AR 654.) The five-page, single-spaced report goes into substantial detail about Ms. Lee's present illness, treatment history, family and social history, ability to relate to others, daily activities, present interests, medication, and diagnosis. It also provides observations by Dr. McGill regarding Ms. Lee's appearance and demeanor, attitude and behavior, intellectual functioning, and mood and affect. In her decision the ALJ summarized what Ms. Lee reported to Dr. McGill:

> She could not pay for her medications and so it was hard to motivate herself to go for treatment. She cried a lot, got lost and forgot where she was going, when she was off of or could not afford medications. Her concentration level was low and she was

easily distracted. She was often not sleeping 3-4 days and then sleeping too much. However, her medications also made her sleepy. On the other hand, her last episode without sleep was two months earlier when she roamed downtown for three days, homeless and afraid to sleep because someone could hurt her. She had cut on herself in the past, the last episode five months before. She admitted when she was depressed she felt no one cared and missed appointments or had no money for the bus. She had been totally abstinent from meth and weed for three years, but admitted pot from 12-31 and meth 12 years regularly. Her legal history included charges for paraphernalia, attempted forgery and a pending charge for receiving stolen merchandise which she was fighting. She had been in jail once two years before for paraphernalia which was not hers and forgery in 2006. She liked to isolate, shut herself off, avoided family activities. She denied suicidal ideation and slept up to 16 hours a day because of her medications, she thought. She said she heard someone say her name and she was startled by it, but denied paranoia, and delusions. She spent much time with family who now lived nearby. She spent time with her nephews in their teens e-play, watched movies and messed around. She loved her kids and was very close and very involved in their lives. They all sounded very successful. She took public transportation and did regular ADLs and stayed busy and went to appointments. She watched TV and read Ann Rice books. She related pretty much to her family, had no problems with bosses or supervisors but had made bad choices in men. The one who forged the check was now in prison . . . .

(AR 21.) Dr. McGill also noted that Ms. Lee had a "somewhat sloppy appearance," reported being homeless for three months prior to moving in with her mother and sister in May 2008, and had personal habits within normal limits. (AR 654, 657.)

Finally, the report provides Dr. McGill's opinion regarding Ms. Lee's diagnosis, prognosis, and competency. (AR 657.) Dr. McGill diagnosed Ms. Lee with bipolar disorder, polysubstance abuse (three years in full remission), personality disorder mixed anti-social/borderline features, with a GAF of +60. (AR 657.) Dr. McGill stated that Ms. Lee "likely will be able to do half time-up to 20 hr a week work with continued treatment/meds and abstinence-uncertain she will ever be able to work full time." (AR 657.) She also reported that she believes Ms. Lee is competent to manage her finances.

On the same day the Form 20M was completed, Dr. McGill completed a Work Ability Report. The report concluded that Ms. Lee was able to work fifteen hours a week and could begin part-time work immediately. Ms. Lee's knee troubles were noted and Dr. McGill recommended continued treatment at VMH.

Although Dr. McGill's Form 20M report stated that she first examined Ms. Lee in June 2008, the record contains two Workplace Functional Ability Reports from 2006 signed by Dr. McGill. On May 17, 2006, Dr. McGill opined that Ms. Lee's "Current Functional Ability Profile Level" was eight out of ten and she was able to participate in work activities less than full-time (five to ten hours a week) and gradually increase to full-time within six to twelve months. (AR 663.) Dr. McGill also noted that Ms. Lee was "not yet stable on her own" and recommended continuing with VMH treatment and work approach activities. (AR 663.)

On November 1, 2006 a second Workplace Functional Ability Report was completed by Dr. McGill. (AR 661.) In this report Dr. McGill noted that Ms. Lee had not worked in two years, was "not stable," and given her condition she could not work at all. She recommended treatment and work training and indicated that Ms. Lee would most likely only be able to work part time "at best." (AR 661.)

The ALJ gave "Dr. McGill's reports not controlling weight" and found them "unpersuasive." (AR 21.) The ALJ lists the following reasons for her assessment of the little weight given to Dr. McGill's medical opinion: (1) "the medical record fails to indicate the claimant ever saw Dr. McGill in 2006;" (2) the June 2008 report by Dr. McGill "is not supported by separate progress notes;" and (3) the bulk of the report recites self-reported symptoms from Ms. Lee that are not corroborated in other parts of the medical record. (AR 22.) The ALJ also

concluded that Dr. McGill's assessment of Ms. Lee's GAF score as +60 indicates mild symptoms, which is consistent with the opinions of Dr. Enright and Dr. Brill.

Similar to her criticism of Dr. Albertsen's medical opinion, the ALJ discounts Dr. McGill's opinion based largely on the lack of progress notes. And for the same reasons stated above in reference to Dr. Albertsen, the ALJ had an affirmative duty to request additional evidence or clarification from Dr. McGill if she found the evidence supporting the opinion to be inadequate.

### Dr. Finnegan

Robert F. Finnegan, M.D. is a physician at Health Clinics of Utah in Salt Lake City. (AR 659.) On August 14, 2008 he completed a Work Ability Report for Melissa Lee for the Department of Workforce Services. (AR 659.) This report appears to be the only document in the administrative record—other than the ALJ's decision—referencing Dr. Finnegan or completed by Dr. Finnegan. Dr. Finnegan indicated that Ms. Lee has osteoarthritis in both knees and has had four surgeries on her right knee. He went on to opine that she could not work at all due to her knee problems and that nothing could be done to help her return to work. Despite his determination that she could not work, Dr. Finnegan found that she could lift up to ten pounds occasionally and that she could stand for 15-20 minutes. (AR 659.) He indicated that her condition was lifelong and when she could return to work was "indeterminate."

The ALJ found that Dr. Finnegan's report was not entitled to controlling weight and gave it "little weight for the following reasons: The medical record contains no progress notes whatsoever to support his assessment. His assessment is inconsistent with that of Dr. Paulos and the State agency physicians. It is also inconsistent with the claimant's activities of daily living as

22

reported to Dr. McGill in June 2008 (B27F/5-9)." (AR 22.)

Ms. Lee argues that the ALJ wrongly rejected Dr. Finnegan's opinion because it was "probative rather than cumulative." (Pl's Br. at 13.) The same statement is reiterated in Plaintiff's Reply Brief verbatim. (Pl's Reply at 4.) Ms. Lee does not provide a substantive discussion of Dr. Finnegan's opinion or the reasons why the ALJ erred in her assessment of the medical opinion. The Commissioner attacks Ms. Lee's "single, dangling reference" to the form completed by Dr. Finnegan because it fails to frame an argument that the ALJ erred and the issue as stated is "insufficient to invoke appellate review." (Def's Br. at 12.)

Although the ALJ's assessment of Dr. Finnegan's opinion is somewhat cursory, a thorough review of the administrative record reveals that her determination supported by substantial evidence. First, Dr. Finnegan does not appear to have had a long-term treatment relationship with Ms. Lee. The only record indicating that he treated Ms. Lee was the Work Ability Report he completed. Additionally, as the ALJ pointed out, Dr. Finnegan's opinion is inconsistent with the record as a whole.

The Administrative Record includes extensive medical records related to Ms. Lee's knee surgeries. The medical records do not reference Dr. Finnegan, but do include these doctors: Les Harris (AR 354), John Skedros (AR 376), and Lonnie Paulos (AR 400). Ms. Lee's last knee surgery prior to 2008 was in 2005. Following the 2005 surgery, Dr. Paulos noted these permanent restrictions on a Workers Compensation Form: no deep knee bending, no squatting/kneeling/crawling, no climbing stairs or ladders, no prolonged standing or walking on hard surfaces, and only sedentary work. (AR 481.) Also, after completing a consultative examination on March 17, 2007, Justin Johnsen, M.D., concluded "patient's knee was stable and

she had a normal range of motion. She did not have any weakness, or leg droop associated with a cut nerve." (AR 613.)

As the ALJ implies, these assessments are in conflict with the conclusion of Dr. Finnegan that Ms. Lee can do no work at all due to the osteoarthritis in her knees. The ALJ also noted an inconsistency between Dr. Finnegan's opinion that Ms. Lee could not work and her daily activities. (AR 22.) The record indicates Ms. Lee was able to walk several blocks to appointments in 2004 (AR 370) and "roamed downtown" for three days in April 2008 when she was homeless and afraid to sleep (AR 654). Thus, there does appear to be inconsistency in the level of impairment assessed by Dr. Finnegan and Ms. Lee's actual mobility.

Finally, Ms. Lee's counsel acknowledged that her limitations as a result of her physical injuries "probably gets her to sedentary work but I don't think there's enough there for a meeting of a listing . . . ." (AR 36.) Thus, Ms. Lee acknowledges that her knee injuries are not completely disabling. This acknowledgment in conjunction with the short treatment relationship and inconsistencies with the other medical opinions and Ms. Lee's activity level provide substantial evidence for the ALJ's conclusion that Dr. Finnegan's report be entitled to little weight.

### *Summary*

In sum, the ALJ failed to provide sufficient evidence in support of the weight given to Dr. Enright's opinion to allow for meaningful review. Although every factor listed in § 404.1527(d)(2) need not be addressed, the ALJ must address any inconsistencies with the opinions of Ms. Lee's treating psychologists. Also, if the opinion of Dr. Enright is not supported by relevant evidence, it should be given diminished weight.

Furthermore, the ALJ's finding that the opinions of Drs. Albertsen and McGill were entitled to "not controlling" and "diminished" weight is not supported by substantial evidence. The ALJ is critical of the opinions of these doctors largely because the record is devoid of progress notes that mirror the conclusions in their reports. Because it appears that the ALJ found the evidence from the doctors inadequate to determine the extent of Ms. Lee's limitations, she had a duty to seek additional evidence or clarification from these treating sources.

Evidence of these particular factors may be useful to the ALJ: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; [and] (3) the degree to which the physician's opinion is supported by relevant evidence . . . ." 20 C.F.R. § 404.1527(d)(2). Accordingly, this case must be reversed and remanded to the ALJ in order to determine the proper weight to afford to the medical opinions of Drs. Enright, Albertsen, and McGill. Once this error is corrected and appropriate weight is attributed to these opinions, the ALJ will need to revisit her assessment of Ms. Lee's residual functional capacity in light of these determinations.

### B. Claimant's Credibility

In general, every witness who takes the stand puts his or her credibility at issue. Whether a witness is believable or not is especially important in assessing an individual's subjective description of his or her own pain or symptoms. Under the regulations the ALJ engages in a two-step process to evaluate self-reported symptoms. SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or

other symptoms." *Id.* The ALJ in this case engaged in this inquiry and found that Ms. Lee's

impairments could reasonably be expected to produce the symptoms she alleged. (AR 13.)

Neither party challenges this finding.

Second, "whenever the individual's statements about the intensity, persistence, or

functionally limiting effects of pain or other symptoms are not substantiated by objective medical

evidence, the adjudicator must make a finding on the credibility of the individual's statements

based on a consideration of the entire case record." SSR 96-7p, at *2. When assessing

credibility of an individual's statements the ALJ is instructed to consider the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at 3. Additionally, the consistency of an individual's statements regarding the intensity,

persistence, and functional effects is a "strong indicator of credibility." *Id.* at *5. Persistent

efforts by the individual to obtain relief from his or her symptoms also lends support to that

person's allegations of intense and persistent symptoms. *Id.* at *7. However, explanations from

the individual may shed light on the credibility issue, *e.g.,* an individual may not consistently take

his or her prescription medications because they cannot afford them. *Id.* at *8.

The ALJ's determination of a claimant's credibility must stand "[s]o long as the ALJ sets forth the specific evidence he relies on . . ." rather than merely reciting the general factors he considered. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The reasons behind the credibility determination must be "'sufficiently specific' to inform subsequent reviewers of both the weight the ALJ gave to a claimant's statements and the reasons for that weight." *Hayden v. Barnhart*, 374 F.3d 986 (10th Cir. 2004) (citing SSR 96-7p, at *4.); *Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004). The credibility finding must also be "closely and affirmatively linked" to substantial evidence. *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (quoting *Hardman v. Barnhart*, 362 F.3d 676, 678-679 (10th Cir. 2004)). However, "a finding that an individual's statements are not credible . . . is not in itself sufficient to establish that the individual is not disabled." SSR 96-7, at *4.

In this case the ALJ found that Ms. Lee's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" the ALJ's assessment that Ms. Lee has the RFC to perform light work with some limitations. (AR 13.) In making this determination, the ALJ considered a variety of factors including: inconsistencies between objective medical evidence and her reported symptoms related to her knees; the impact of drug and alcohol abstinence on her mental status; side effects of her medications; Ms. Lee's therapy attendance records; and her compliance with prescribed medication treatment.

Generally, the ALJ found that Ms. Lee's description of her symptoms was more severe than the record indicated. (AR 24.) She provided several examples. First, the ALJ noted that objective medical evidence indicated that Ms. Lee is able to "squat and rise with ease, she could

rise from a sitting positions [sic] without assistance, had no difficulty getting up and down from the exam table, could walk on heels and toes, could hop on each foot, had normal tandem walking and had normal range of motion in her knee, which was stable." (AR 14.) This evidence does not support Ms. Lee's contention that she is able to do only sedentary work as a result of her knee problems; thus, she claims more severe impairment than the record suggests.

Next, the ALJ noted Ms. Lee's testimony that she has problems with concentration, being around people, and nightmares. The ALJ identified several pieces of evidence which she implied indicate otherwise including Ms. Lee's failure to report these symptoms to a therapist and several instances where Ms. Lee mentioned relationships and interactions with people. (AR 14.) The record does not wholly support the ALJ's recitation of the facts—Ms. Lee did complain about nightmares[11] and has reported difficulty being around people (AR 370, 371, 656), but the ALJ noted with specificity several examples that support her finding.

The ALJ then reported that Ms. Lee claims "these problems are severe enough to preclude working." (AR 15.) This assertion was not found credible by the ALJ due to multiple references in the medical record that documented improvement of Ms. Lee's mental status when she abstained from illegal drugs and alcohol. The record also contained several statements by Ms. Lee's doctors indicating improvement when she was taking her prescription medications and more difficulty when she stopped taking the medications.

Additionally, the ALJ concluded that Ms. Lee "has not been very serious about her treatment." (AR 15.) Ms. Lee "has not been complying with the DWS requirement as far as

---

[11] (AR 573 (Dr. Hallet noted in Ms. Lee's record following an in person appointment on April 27, 2006 that "Her concern today is waking up in the middle of the night having nightmares. some of which are related to a past event.").)

treatment participation or participation in their recommended work-related tasks."  (AR 15.)

"The medical record is replete with broken and cancelled appointments" and she has failed to

"comply with prescribed medication treatment."  (AR 15-16.)

Finally, several other "contradictions" in the record are pointed out by the ALJ including:

an inconsistency in how often Ms. Lee said she goes to the library; Ms. Lee's report that she had

a cut nerve, but she did not have the weakness or leg droop associated with that type of injury;

inconsistency in when Ms. Lee reported she last used drugs and how much she drinks alcohol;

inconsistency in her descriptions of run-ins with the law; and different explanations of why she

quit her last job at Taco Bell.  (AR 14-17.)

Ms. Lee argues that before the ALJ makes a finding of noncredibility based on her failure

to pursue treatment or take prescribed medication, the ALJ must apply the elements laid out by

the Tenth Circuit in *Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993) (citing *Frey v. Bowen*,

816 F.2d 508 (10th Cir.1987).  The Court need not reach that question, however, because the

ALJ provided several bases for her credibility determination outside of the realm of

noncompliance.  Moreover, *Qualls v. Apfel*, 206 F.3d 1369 (10th Cir. 2000) limited *Frey's*

application to those situations where benefits were denied because a claimant refused to follow

prescribed treatment.  Here, the ALJ did not purport to deny Ms. Lee benefits because she failed

to follow prescribed treatment; rather, she looked at Ms. Lee's inconsistency in attending her

therapy appointments and take her prescribed medications as evidence that "she has not been

very serious about treatment."  (AR 15.)

Additionally, argues Ms. Lee, failure to attend therapy or take medications has different

implications in the context of mental illness.  She points to *Regennitter v. Commissioner of*

*Social Security Administration*, 166 F.3d 1294 (9th Cir. 1999). In the *Regennitter* case the court concluded the ALJ erred by rejecting the claimant's testimony. *Id.* at 1300. Regennitter's initial injury occurred in 1988 when a large beam fell onto his head and rolled onto his shoulder. Regennitter complained at his disability hearings "of severe daily headaches; constant pain in his neck, shoulder, and back; occasional crying spells; and almost daily, half-hour-long panic attacks. He estimated that he can stand and walk for a total of two hours each day and sit for a total of three or four hours per day." *Id.* at 1296. The ALJ asserted that Regennitter's complaints were inconsistent with his lack of treatment in recent years, inconsistent with clinical observations, and speculated that he had "chosen a sedentary lifestyle 'perhaps related to divorce and child support issues.'" *Id.* at 1298. The Ninth Circuit held that substantial evidence did not support the ALJ's credibility determination despite facially cogent reasons for rejecting his testimony.

Of particular relevance in this case is the Ninth Circuit's discussion of Regennitter's failure to seek and attend treatment and his reasons for not taking prescription medications. The Ninth Circuit noted that Regennitter could not afford treatment and medications because he had no income for years and had incurred thousands of dollars of debt. The court found his poverty a compelling reason to excuse noncompliance. Additionally, the court pointed out that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Id.* at 1300 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).

In some ways this case is similar to the *Regennitter* case: Ms. Lee struggles with both physical and mental impairments just as Regennitter did and Ms. Lee also indicates that finances

have impacted her ability to continue with treatment. (Pl's Br. (dkt. no. 16), at 6.) However, key distinctions also exist. In *Regennitter* the claimant's explanation that he could not afford treatment was uncontested while here it is contested. (Def's Br. (dkt. no. 18), at 21.) Also, in *Regennitter* the claimant provided an explanation for essentially terminating his treatment regimen—no effective treatments for his pain were provided and his insurance coverage ran out—while here Ms. Lee and the record provide very few reasons for her repeatedly cancelled and broken therapy appointments. Although these cases are different enough that the end result should also differ, *Regennitter* makes an important point—a claimant's failure to attend treatment or take medications should be weighed differently in cases involving mental impairments. The ALJ should explicitly consider whether the person's mental impairments impacted their efforts to seek treatment and stay on medications.

Here, Ms. Lee makes only a brief suggestion that she was noncompliant due to her mental impairments (Pl's Br. (dkt. no. 16), at 6; AR 654.) Without more it cannot be said that substantial evidence does not support the credibility finding of the ALJ. The ALJ considered the factors laid out in SSR 96-7p. She did not address each factor individually, but the law requires only that she sets forth the specific evidence she relied on rather than merely reciting the general factors and link her credibility finding to that evidence. The ALJ's finding that Ms. Lee's description of the intensity, persistence, and limiting effects of her symptoms was not credible should be AFFIRMED. The ALJ applied the proper legal standard and did more than merely recite the proper factors for determining credibility. She listed in detail specific evidence to support her credibility finding and sufficiently, although not flawlessly, linked the evidence to the factors and the overall weight she gave to Ms. Lee's description of her symptoms. Thus,

substantial evidence supports the credibility finding. As noted above, this finding alone is insufficient to establish that Ms. Lee is not disabled.

### C. Vocational Expert's Opinion

Step five of the sequential evaluation process to determine disability shifts the burden to the Commissioner to establish whether "any other work (jobs) that [the claimant] can adjust to . . . exist in the national economy." 20 C.F.R. § 1560(c). Testimony by a vocational expert (VE) is one means by which the Commissioner can meet that burden. *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993); 20 C.F.R. § 404.1567(e). In order for the VE's testimony to constitute substantial evidence to support the ALJ's finding, the hypothetical posed to the VE for his or her expert opinion must relate with precision to all of the claimant's impairments. *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991). However, the hypothetical questions "need only reflect impairments and limitations that are borne out by the evidentiary record." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996).

Here, the ALJ's determination of Ms. Lee's RFC is not supported by substantial evidence because the ALJ failed to recontact Ms. Lee's treating doctors when she found unresolved conflicts and ambiguities in their opinions. The hypothetical posed to the VE, Mr. Hurst, was based in part on the ALJ's determination of Ms. Lee's RFC. (AR 70.) Therefore, this issue must also be remanded for further consideration in light of the ALJ's revised determination of RFC.

### <u>CONCLUSION</u>

Based on the above analysis, IT IS HEREBY ORDERED that pursuant to sentence four of 42 U.S.C. § 405(g) the Commissioner's decision denying Ms. Lee's application for SSI and DIB is REVERSED and REMANDED for further administrative proceedings consistent with

this order and judgment.

IT IS FURTHER ORDERED that judgment shall be entered in accordance with Fed. R. Civ. P. 58, consistent with the United States Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292, 296-302 (1993).

DATED this **23** day of June, 2011.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge